UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: INTEGRATED ELECTRICAL | § | CIVIL ACTION NO 4:04-CV-3342 |
| SERVICES, INC. SECURITIES LITIGATION | § | |
| | § | CONSOLIDATED AMENDED |
| | § | COMPLAINT FOR VIOLATIONS |
| | § | OF FEDERAL SECURITIES LAWS |
| | § | |
| | § | CLASS ACTION |

# MEMORANDUM AND ORDER

I.   INTRODUCTION

Plaintiff Central Laborers' Pension Fund has filed this class action against Integrated

Electrical Services, Inc. ("IES"), its president and chief executive officer, and two former chief

financial officers.   Plaintiff alleges violations of the Securities Exchange Act of 1934.

Defendants have jointly filed a Motion to Dismiss, arguing that Plaintiff has failed to meet the

pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").   Most

fundamentally, Defendants contend that Plaintiff fails to allege facts that raise a strong inference

that any of the individual Defendants knew, or was severely reckless in not knowing, of the

falsity of certain statements that he made as to IES's financial condition.   After reviewing the

parties' filings, the Court finds that the Motion, Docket No. 31, should be and hereby is

GRANTED.

II.   FACTUAL BACKGROUND

IES provides electrical contracting and maintenance services, as well as data

communication services.   Its stock is traded on the New York Stock Exchange.   Plaintiff alleges

that, through the end of 2002 and the first quarter of 2003, IES was experiencing a stagnant stock

1

price and a lack of attention from stock analysts.  Plaintiff also alleges that, to overcome these problems, IES created its own "Company and Investment Profile" ("CIP") to increase the company's visibility and make it more attractive to investors.  From the first release of  its CIP on April 1, 2003 until the spring of 2004, IES's stock price rose from around $4.00 per share to more than $11.00.  Plaintiff further contends that IES's newly enhanced financial position allowed IES to close a $175 million senior credit facility, and also allowed certain executives to exercise their stock options.

On August 13, 2004, IES disclosed that its independent auditors had found material weaknesses in the company's internal controls.  This eventually led the company to restate two and a half  years of financial results and substantially lower its earnings per share and other financial results for fiscal years 2002 and 2003 and the first two quarters of 2004.

Plaintiff has brought this class action on behalf of all purchasers of the common stock of IES between April 1, 2003 (the date of the first CIP) and August 13, 2004 (the date the company disclosed the material weakness in its internal controls).

III.    PLAINTIFF'S ALLEGATIONS

Plaintiff adduces various statements, acts, and omissions in seeking to meet the pleading requirements of the PSLRA.  The most important of Plaintiff's allegations are:

1.    That a numbers of insiders exercised stock options and sold IES stock while the price was inflated.

2.    That the restatement IES was required to make lowered its previously stated net income by 14%.

2

3.     That the CIP was an effort at "stock touting" and routinely omitted material, unfavorable information about IES.

4.     That unnamed confidential sources have informed Plaintiff's lawyers that there was widespread knowledge throughout IES that financial information

that IES was communicating to the investing public was materially inaccurate.

5.     That the individual Defendants were motivated by a need to obtain a favorable credit facility and otherwise improve IES's market position.

A.     <u>Sales of Stock During the Class Period</u>

Plaintiff alleges that, during the proposed class period, six IES insiders sold stock at artificially inflated prices ranging from $7.50 to $11.32 per share.  (Am. Compl. at 67 ¶ 146.)  In this circuit, the law is clear that "[o]nly insider trading in suspicious amounts or at suspicious times is probative of scienter."  *Abrams v. Baker Hughes*, 292 F.3d 424, 435 (5th Cir. 2002).

Plaintiff and Defendants agree that Defendant Herbert Allen ("Allen"), who was at all relevant times the president and chief executive officer of IES, sold 30,000 shares of IES stock during the proposed class period.  Allen retained, however, 704,400 shares of IES stock, plus vested stock options.  Not even counting the stock options, Allen sold less than 4% of his IES holdings.  Plaintiff has not, therefore, pled facts sufficient to show that Allen's sales were suspicious in either amount or timing.

Plaintiff also alleges that Defendant William W. Reynolds ("Reynolds"), who was IES's chief financial officer from June 2000 until he resigned in April 2004,[1] engaged in suspect sales of his stock and exercises of his stock options.  According to Plaintiff, Reynolds sold 351,000 IES shares during the proposed class period and kept only 19,781 shares.  He realized sales proceeds of $1,440,000.00.

Defendants contend that all of Reynolds's sales have a non-suspicious explanation.  In particular, Defendants allege that all of the sales were the result of a) his divorce, which was finalized on November 26, 2003 (nine days after the initial trade);  b) the implementation of a "10B-5 plan," which provided for automatic and non-discretionary sales of Reynolds's IES stock; c) his imminent departure from IES; or d) all three.  Defendants provide exhibits that corroborate their contentions.  The Court is unable to conclude that Reynolds's stock sales, under these circumstances, were suspicious in amount or timing.

Plaintiff also relies, for its allegations as to scienter, on sales by four other IES insiders. There is a considerable question, however, as to the relevance of sales by those who did not themselves make statements alleged to be deceptive.  *See, e.g.*, *In re Ciena Corp. Secs. Litig.*, 99 F. Supp. 2d 650, 663 n.11 (D. Md. 2000).  In any event, the sales, on the facts pleaded, do not create a strong inference of scienter.

B.    IES's Restatement of its Financial Statements Over a Thirty-Month Period

Arguably Plaintiff's strongest evidence for an inference of scienter is that IES did have to restate its financial statements for fiscal years 2002 and 2003 and for the first two quarters of

---

[1] Defendants contend that he resigned on March 22, 2004.  (Defs.' Joint Mem. in Support of their Mot. to Dismiss Lead Pl.'s Am. Compl. at 25.)

fiscal year 2004.  The effect of the restatement was to reduce IES's net income for the thirty month period by 14%, from $42.1 million to $36.5 million.

Nonetheless, the law is clear that a restatement of financial data, by itself, does not create a strong inference of scienter.  "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.  The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information."  *Barrie v. Intervoice-Brite, Inc.* 397  F. 3d 249, 264 (5th Cir. 2005) (quoting *Fine v. Am. Solar King Corp.,* 919 F. 2d 290, 297 (5th Cir. 1990)).

Indeed, complaints have been dismissed where "[p]laintiffs point to no specific internal or external report available at the time of the alleged misstatements that would contradict them." *Abrams,* 292 F. 3d at 433.  In this instance, the magnitude of the restatement surely cannot, by itself, support an inference of scienter.  The restatement reduced net income by $5.7 million over a thirty-month period, at a time when IES's total annual revenues consistently exceeded $1 billion.  The accounting errors that did occur, in other words, did not disguise a failing company or turn an ostensible profit into a loss.

Moreover, all but one of the accounting issues that led to the restatement occurred among IES's subsidiaries.  In such a circumstance, the Fifth Circuit requires particularized allegations that create a strong inference that officers of the parent were aware of the issues among the subsidiaries  when erroneous statements were issued.  *See Sushany v. Allwaste, Inc.,* 992 F. 2d 517, 523 (5th Cir. 1993).  In one portion of its Amended Complaint, Plaintiff lists a series of accounting principles that Defendants are said to have violated.  (Am. Compl. at 63-64 ¶ 139.) For example, the  Amended Complaint refers to violations of "the principle that the financial

information should be complete" and of "the principle of fair presentation." (*Id.*)  This highly generalized form of pleading is insufficient.  *See Southland Securities v. Inspire Ins. Solutions,* 365 F. 3d 353, 362 (5th Cir. 2004).  In other portions of the Amended Complaint, Plaintiff does allege specific accounting errors. (*See, e.g.,* Am. Compl.  ¶¶ 34, 41, 44, 87, 95, 127-28, 130-34, 157-60.)  As to these errors, however, Plaintiff does not include particularized pleadings that any of the individual Defendants knew of the erroneous accounting at the time that the contrary information was conveyed to investors.  The alleged errors – for example, failure to make timely and appropriate adjustments for contracts that were accounted for on a percentage of completion basis –  are not the kinds of self-evident error that any reasonable accountant or chief executive could be assumed readily to have perceived.  Here, again, Plaintiff's pleadings simply fail to provide even a weak inference of scienter.

Plaintiff additionally argues that Defendants' alleged  misrepresentations of the adequacy of IES's internal controls are misstatements of fact.  (Lead Pl.'s Mem. in Opposition to Defs.' Mot. to Dismiss at 11.)  Defendants contend that, in part because the relevant language includes the words "concluded" and "believe," the statements are ones of opinion.  (Defs.' Joint Reply at 22.)  The Court finds it is unnecessary to resolve this specific disagreement.  The Amended Complaint simply does not contain allegations sufficient to provide a strong inference of scienter – i.e., that, at the time that the statements were made, Defendants knew that they were false or were severely reckless in not knowing of their falsity.

C.    The CIP as Unlawful "Stock Touting"

Plaintiff alleges that Defendants' implementation of the CIP was a significant factor in the sharp rise of IES's stock price during the proposed class period.  This may well be true.

6

Even if so, however, there is nothing illegal about the creation or implementation of such a communication format.   Because the pleadings do not provide an inference of scienter as to misstatements allegedly contained in the CIP, the CIP is not a separate basis for liability.

      D.    Confidential Sources

Plaintiff's Amended Complaint includes many statements, attributed to confidential sources, to the effect that critical problems at IES were well known and consistently ignored. (Am. Compl. at 68-74 ¶¶ 151-70.   Well-established precedents make clear, however, that pleadings are insufficient if they allege only that "defendants must have been aware of the misstatement based on their positions within the company." *Abrams,* 292 F. 3d at 432 (footnote omitted).   Only two of the statements attributed to the confidential sources approach adequacy. One confidential source attributes to Allen a statement that he "didn't need to hear the details of [a] revenue problem."   (Am. Compl. at 73 ¶ 166.)   Even assuming that Allen made the remark, it is susceptible to many interpretations, including innocent ones.   For example, Allen may not have needed to hear about the problem because he already knew about it.   The second statement, attributed to a "former network technician," is that the technician's "colleagues in IES's accounting department had indicated the Company's CFO was aware" of accounting problems at IES.   (*Id.* at 74 ¶ 168).   There is no date given and no indication of which of IES's different Chief Financial Officers is being referred to or when.   In sum, the confidential sources' statements simply do not offer any inference, much less a strong one, of scienter.

      E.    Defendants' Desire to Obtain a Credit Facility and Improve Market Position

Plaintiff acknowledges that Defendants' having obtained a favorable credit facility "would, standing alone, not raise a strong inference of scienter."   (Lead Pl.'s  Mem. at 33.)   The

same is true of Defendants' desire to meet earnings expectations and generally to improve IES's standing within the investment community.   Such motives are common to almost all economic actors in a market economy.  *See Coates v. Heartland Wireless Comms., Inc.,* 100 F. Supp. 2d 417, 431 (N.D. Tex. 2000) ("A generalized motive that could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.") (internal quotation marks omitted).

IV.    CONTROL PERSON LIABILITY

Plaintiff has also brought claims under Section 20(a) of the Exchange Act against Defendants as alleged "control persons."   Because Plaintiff has failed to allege an underlying violation of the securities laws, the control person claim must also fail.  *See ABC Arbritrage v. Tchuruk,* 291 F. 3d 336, 362 n.123 (5th Cir. 2002).

V.    CONCLUSION

For all of the foregoing reasons, Plaintiff's claims are DISMISSED WITH PREJUDICE. The Court reaches this conclusion with some reluctance.  In a case such as this one, a plaintiff faces a formidably daunting task in meeting the requirements of the PSLRA without having had the benefit of discovery.  Nonetheless, the law is clear, and it is beyond this Court's authority to attenuate it.

IT IS SO ORDERED.

Signed this 10th day of January, 2006.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

8